# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------x

SHARON HAWKINS, derivatively on behalf of
MEDAPPROACH, L.P. and individually,

    *Plaintiff*,

v.

MEDAPPROACH HOLDINGS, INC., and W.
BRADLEY DANIEL,

    *Defendants*,

  -and-

MEDAPPROACH, L.P.,

    *Nominal Defendant*.

------------------------------------------x

Case No.: 1:13-cv-5434-ALC-DCF

## DECLARATION OF BRADLEY DANIEL IN SUPPORT OF DEFENDANTS' MOTION TO ENFORCE SETTLEMENT AGREEMENT

I, W. Bradley Daniel, hereby declare and state as follows:

1. I am the principal and owner of MedApproach Holdings, Inc. ("MedApproach Holdings"). I respectfully submit this declaration in support of Defendants' Motion to Enforce Settlement Agreement. I make this declaration of my own personal knowledge and, if called and sworn as a witness, I could and would testify competently to the matters set forth herein.

2. On December 20, 2011, MedApproach Holdings filed a lawsuit in the United States District Court for the Middle District of Tennessee against Gregory D. Hawkins and Sharon Hawkins, captioned *MedApproach Holdings, Inc. v. Gregory and Sharon Hawkins*, Case No. 3:11-cv-1199 (the "TN Lawsuit"), asserting, among other things, that the Hawkinses failed

to pay management and other fees owed to MedApproach Holding. Attached hereto as Exhibit A is a true and correct copy of the complaint filed in the TN Lawsuit.

3. On August 2, 2013, shortly after the TN Lawsuit survived certain dispositive motions, Sharon Hawkins filed a lawsuit in retaliation in the United States District Court for the Southern District of New York against MedApproach Holdings and myself, captioned *Sharon Hawkins on behalf of MedApproach, L.P. v. MedApproach Holdings, Inc. and W. Bradley Daniel*, Civil Action No. 1:13-cv-5434-ALC (the "NY Lawsuit").

4. The NY Lawsuit asserted, among other things, a challenge to a proxy that I hold to vote and control the shares of ND Management, Inc. ("NDM"), which is the general partner of an entity called Danco Investors Group ("Danco"). This proxy gave the proxy holders control over the enterprise consisting of various corporate entities, which was created to protect the confidentiality of the investors, given the controversial nature of the pharmaceutical product the corporate entities were developing and selling. The NY Lawsuit also claimed breaches of MedApproach's Limited Partnership Agreement and certain fiduciary duties due to alleged failure to make certain distributions, and because of taxation on NDM due to its status as a "C Corporation." Attached hereto as Exhibit B is a true and correct copy of the complaint filed in the NY Lawsuit.

5. Following the filing of the TN Lawsuit and the NY Lawsuit, MedApproach Holdings has engaged in numerous negotiations with Mr. and Mrs. Hawkins in order to resolve our differences. This included an unsuccessful settlement conference before Magistrate Judge Freeman on December 12, 2014.

6. On November 30, 2015, the Court issued the second motion to dismiss in this case, once again dismissing the proxy-related claims of the Plaintiff. Following that dismissal,

counsel for the parties again discussed the possibility of reaching a global settlement that would dispose of all remaining issues in both the TN Lawsuit and the NY Lawsuit.

7.   After some discussion of whether we should mediate or engage in a private negotiation, the parties decided to meet in Nashville for the private, face-to-face settlement conference. On February 2, 2016, I attended a day-long settlement conference at the Offices of Waller Lansden, my attorneys, in Nashville, Tennessee. Also present at the settlement conference were Gregory Hawkins and his counsel, Bill Ramsey, as well as my counsel, Bob Boston and Jeffrey Simes, and Angelia Van Vranken, who is the Chief Financial Officer for several of the corporate entities involved in this case. Mr. Hawkins was attending on behalf of himself and his wife, Sharon Hawkins, although both were invited to the conference. Our stated purpose for holding the conference was to attempt to reach a global settlement that would resolve all of our various disputes and the two lawsuits.

8.   At the end of the day, Mr. Hawkins and I reached an agreement to settle our disputes and dismiss the two cases. Together, and with the assistance of our counsel, we jointly marked up and initialed Mr. Simes' September 16, 2014 letter, which was a settlement counter-proposal to Mr. Ramsey's September 5, 2014 settlement proposal. We memorialized the agreement in writing because we had had several failed attempts at settlement and did not want this agreement to fail for lack of a settlement document. The terms that we agreed to on February 2, 2016 were memorialized in the settlement letter along with hand-written notations by Mr. Simes and Ms. Van Vranken on the letter, which were made in the presence and with the agreement of Mr. Hawkins and his counsel. Mr. Hawkins and I, as well as our attorneys present at the February 2, 2016 settlement conference, initialed each page of the marked-up letter to evidence our intent to be bound by the settlement terms. Mr. Hawkins' initials are the "GDH"

that appear the second from the left on the bottom of each page. My initials are to the right of Mr. Hawkins'.

9. We concluded the settlement conference in a friendly manner. We all shook hands and congratulated each other on the settlement. We discussed our plans to work together as per the Settlement Agreement, and exchanged encouraging words about resuming our working relationship. Attached hereto as Exhibit C is a true and correct copy of the settlement letter that we initialed and signed at the February 2, 2016 settlement conference.

10. As part of the February 2, 2016 settlement agreement, Mr. Hawkins and I agreed to dismiss both the NY Lawsuit and the TN Lawsuit. We also agreed to all monetary and non-monetary terms relevant to corporate governance and reorganization, corporate disclosures, and monetary payments. No terms or issues were left for the parties to discuss. Notably, with respect to corporate governance and organization, we specifically agreed to convert N.D. Management, Inc. ("NDM") into an S Corporation, and we agreed that Ms. Hawkins, as a beneficial owner, would receive non-voting shares of NDM, whereas I would receive voting shares of NDM. We specifically agreed that I would receive the voting shares and the Hawkinses would receive non-voting shares because that would most closely replicate the existing governance structure of the parties' arrangement, which was not otherwise to be disturbed. Although the Hawkinses had previously refused to accept the idea of non-voting shares, they agreed to it on February 2, 2016 as part of the settlement, presumably because they had lost on their proxy-related claims.

11. We also agreed that we would reorganize NDM from a C Corporation into an S Corporation. This was something the Hawkinses requested, because they believed it would reduce taxes.

12. Although our Settlement Agreement contained all of the materials terms of the corporate changes we were agreeing to, it was not practicable for us to draft the Settlement Agreement at the settlement conference so that it itself could serve as the corporate documents that would bring about those changes, especially in light of my fiduciary duties to the NDM investors to ensure that the instrument that they invested in (NDM) would be properly converted. Accordingly, we agreed that our attorneys would bring about the terms Mr. Hawkins and I had agreed to. Thus, Mr. Hawkins and I added the hand-written note "subject to attorney review and discussion" next to provision 1.B of the settlement letter regarding the distribution of voting shares because we knew that our attorneys would need to draft and execute corporate documents to allow for the distribution of NDM shares pursuant to our agreement. Notably, we did not say that the parties would discuss it, because there was nothing left for the parties to discuss. All that was left was for the lawyers to finalize the basic forms that needed to be completed to implement our settlement.

13. Soon after the Settlement Agreement was reached, however, the Hawkinses apparently had something of a change of heart. When we sent them the more formal documentation we had contemplated in the Settlement Agreement, the Hawkinses started to indicate that they wanted to change the deal we had agreed to. Specifically, even though we agreed on February 2, 2016 to maintain the corporate governance structure and give the Hawkinses non-voting shares of NDM, they now insisted on a "veto right"—that is, not merely a voting share, but voting control! When we declined to accede to this new terms, the Hawkinses asserted that the Settlement Agreement was not a settlement agreement.

14. For instance, I am aware that on April 26, 2016, Ms. Hawkins' counsel e-mailed my counsel with a list of demands for inclusion in the corporate documents. I am also aware that

Ms. Hawkins' counsel sent another e-mail on February 8, 2017, recirculating this list of demands that Ms. Hawkins felt "was necessary . . . in order to finalize a settlement." I am aware that Ms. Hawkins' counsel specifically conveyed her demand to re-negotiate a veto right that was previously rejected in the settlement agreement. I am also aware that my counsel, Mr. Simes, objected to the Hawkinses' counsel that a veto right was not part of the Settlement Agreement, and further, he pointed out that there was no basis to alter the control mechanisms of the parties' corporate entities because the Court had dismissed the proxy-related claims.

15. Despite these difficulties, I held up my end of the bargain. On October 11, 2016, MedApproach Holdings and I dismissed the TN Lawsuit with prejudice pursuant to the February 2, 2016 Settlement Agreement. Attached hereto as Exhibit D is a true and correct copy of the stipulation of dismissal filed in the TN Lawsuit. Also attached hereto as Exhibit E is a true and correct copy of the Order of Dismissal filed in the TN Lawsuit.

16. I also held up my end of the bargain by causing Danco to tender two $50,000 payments to Mr. Hawkins as called for under the Settlement Agreement—one for his services to Danco in 2015 and one for his services to Danco in 2016. Specifically, on October 11, 2016, Ms. Van Vranken mailed Mr. Hawkins a letter enclosing a $50,000 check for Mr. Hawkins "services to Danco Investors Group in 2015" and "[p]ursuant to the settlement agreement signed on February 2, 2016." Similarly, on December 12, 2016, Ms. Van Vranken mailed Mr. Hawkins' another $50,000 check "[p]ursuant to the settlement agreement signed on February 2, 2016" for Mr. Hawkins' "services to Danco Investors Group in 2016." Danco mailed these two checks to Mr. Hawkins pursuant to Section 3 of the February 2, 2016 Settlement Agreement, which required Danco to pay Mr. Hawkins a $50,000 "retroactive payment for 2015 plus per annum going forward." To my knowledge, Mr. Hawkins did not return either check nor did he

explicitly object to them being sent. Attached hereto as Exhibit F is a true and correct copy of the October 11, 2016 letter from Ms. Van Vranken to Mr. Hawkins that enclosed the $50,000 check payable to Greg Hawkins. Also attached hereto as Exhibit G is a true and correct copy of the December 12, 2016 letter from Ms. Van Vranken to Mr. Hawkins that enclosed the second $50,000 check payable to Greg Hawkins.

17. On December 5, 2016, Mr. Simes filed, on Defendants' behalf, a joint status report letter with the Court, stating that "[t]he Defendants are in the process of preparing new corporate documents for the entity called ND Management, Inc. as part of the settlement process." Attached hereto as Exhibit H is a true and correct copy of the December 5, 2016 letter from Mr. Simes to Judge Andrew L. Carter.

18. Following the February 2, 2016 settlement conference, I was aware that the parties' counsel were drafting corporate documents to effectuate the settlement terms, namely the re-organization of ND Management, Inc. as an S Corporation. Nonetheless, all of the material terms of the settlement had been reached and memorialized in the February 2, 2016 Settlement Agreement. All that remained to be done was for the lawyers to prepare the necessary forms to implement it.

I declare under penalty of perjury under the laws of the State of Tennessee that the foregoing is true and correct. Executed this 3rd day of March, 2017, at Nashville, Tennessee.

_____
W. Bradley Daniel

# GOODWIN | PROCTER

Jeffrey A. Simes
212.813.8879
jsimes@goodwinprocter.com

Goodwin Procter LLP
Counselors at Law
The New York Times Building
620 Eighth Avenue
New York, NY 10018
T: 212.813.8800
F: 212 355 3333

September 16, 2014

**VIA EMAIL AND U.S. MAIL**

R. Scott Thompson, Esq.
Lowenstein Sandler LLP
65 Livingston Avenue
Roseland, NJ 07068

    Re:    **MedApproach, L.P. and N.D. Management, Inc.**

Dear Scott:

This is a privileged settlement communication responding to your settlement proposal of September 5, 2014.

The Defendants are prepared to settle the New York and Tennessee lawsuits on the following terms. We have attempted to use the format of your September 5 proposal for ease of reference.

1. **Corporate Governance and Reorganization of N.D. Management, Inc. ("NDM")**

    A.    NDM will be reorganized as an S Corporation. - *Agreed*

    B.    Pro rata distribution of non-voting shares of NDM to beneficial owners with voting shares distributed to Brad Daniel - *(Subject to attorney review and discussion)*

    C.    Installation of an advisory board for NDM to include Sharon and/or Greg Hawkins and others mutually agreed upon. Members would be reimbursed for travel and expenses. *Agreed*

    D.    Certain matters or decisions would require consultation with the Advisory Board, including but not limited to partner distributions. - *Agreed*     *Board to incl. Brad, Angelia, Greg, Ray*

    E.    Plaintiff consents to certain compensation as appropriate and consistent with the parties' agreements, including:

        a)    Base compensation for Brad Daniel to manage NDM and Danco Investors Group, L.P. ("Danco") at a base of $455,411.57 per year, with increases and other terms as contemplated in the parties' agreements and in particular Section 15d of the Danco Partnership Agreement. - *Agreed*

        (b)    Continued participation in management incentive plans and other benefit plans. - *Agreed*

        (c)    As contemplated in the Certain Compensation Matters Agreement, Danco will compensate Brad Daniel, at customary market rates, for such additional special services as he may provide to the Partnership from time to time in connection

*[Margin notes: v. Bd. discuss: get distribution major acquisition operations of Danco]*

*WTR  JJK*

# GOODWIN | PROCTER

R. Scott Thompson, Esq.
September 16, 2014
Page 2

with such matters as public offerings, mergers, sale of assets, acquisition of products and/or assets, and other business combinations and raising of capital. For example, Plaintiff agrees that Brad Daniel will be compensated ~~$75,000 per~~ [$150K per] year for management services to be provided to ~~Danco International LLC and $75,000 per year for management services to be provided to Mifeprium Pharmaceuticals.~~ [other indications and the International mife business]

2. **Disclosures, etc.**

   A. NDM will provide financial statements to Sharon/Greg. - [Agreed]
   B. Additional disclosures as to MedApproach to be provided as agreed upon by the parties. [Agreed]
   C. Greg/Sharon will be re-invited to attend Danco Investors Group Board meetings. Any travel expenses required to attend said meetings will be reimbursed by Danco - [Agreed]

3. **Payments by Sharon/Greg Hawkins** [Brad to be compensated $75K from NDM; Greg to be " $50 from Danco > 1 retroactive payment for 2015 plus per annum going forward]

   A. ~~Plaintiff will pay $475k to MedApproach Holdings, Inc. to settle the TN and NY lawsuits. (This reflects less than half of the total amount past due as we calculate it for the investments in Shiroyama/Resurgence). Brad and Holdings would waive any future claim to payments based on Shiroyama/Resurgence ownership in Danco Investors Group.~~ [deleted]
   B. ~~Greg/Sharon will make a payment of $600k to reimburse NDM for expenses related to the NY lawsuit. This amount represents the portion of expenses attributable to (and thus born by) the LPs other than Greg/Sharon. The parties agree that this amount will be distributed out to the partners other than Greg/Sharon.~~

4. Both lawsuits (SDNY and MD Tenn) terminated with general releases exchanged, carving out ongoing obligations under the MedApproach Limited Partnership Agreement.

We would be happy to discuss this counterproposal with you at your convenience.

Sincerely,

*Jeffrey Simes*

Jeffrey A. Simes

[WTR  DDH  ES  MJR (initials)]